Pearson, C. J.
 

 A slave, being property, has mot the legal capacity to make a contract, and is not entitled to the lights or subjected to the liabilities incident thereto. lie is amenable to the criminal law, and his person (to a certain extent) and his life, are protected. This, however, is not a concession to him of civil rights, but is in vindication of public justice, and for the prevention of public wrongs. Marriage is based upon contract; consequently the relation-of “man and wife” cannot exist among slaves. It is excluded, both on account of their incapacity to contract, and of the paramount right of ownership in them, as property. This subject is discussed in
 
 State
 
 v.
 
 Samuel,
 
 2 Dev. and Bat. 177, where it is held, that a slave is a competent witness for or against another slave, towards whom she sustained the relation of wife, in a certain sense of the term, on the ground that the relation was not that of “ man and wife” in its legal sense, and did not embrace any of the civil rights incident to marriage.
 

 In
 
 Alvaney v. Powell,
 
 1 Jones’ Eq. 35. It is held where a mother and children are emancipated, a child begotten and
 
 *237
 
 born while the mother had no husband, was entitled to the' same share of her estate, as the children who were begotten and born while she had a husband
 
 y
 
 on the ground “that in regard to slaves, even after they become free negroes, there is no necessity growing out of grave consideration of public policy, for the adoption of the stern rule of the common law. “Abastard shall be deemed
 
 nulliusfilius;
 
 to have no parents, and not even be considered the child of the mother who gave it birth ; and in contemplation of law there is no difference between the case of slaves who enter into the qualified relations of “man and wife ” by the express permission of their owners, and that of those who “ take up ” with each other, from a mere impulse of nature, in obedience to the command, “multiply and replenish the earth,” for the law does not re-cognise either relation so as to give to it any effect in respect to civil consequences. On the other hand, there is in moral contemplation, and in the nature of man, a wide distinction between the cohabitation of slaves, as “ man and wife,” and an indiscriminate sexual intercourse; it is recognized among slaves, for as a general rule, they respect the exclusive rights of fellow slaves who are married. Such, marriages are permitted and encouraged by owners, as well in consideration of the happiness of the slaves and their children, as because, in many ways, their interests, as masters, is thereby promoted. Hence a married couple is permitted to have a “cabin and a patch off to themselves,” and where they belong to different persons, the man, at stated times, is allowed “to go to his wife’s house.” The relation is so far favored in the administration of the criminal law, as to allow to it the effect of drawing into application the rule, that when a person finds one in the act of adultery with his wife, and instantly kills him, it is but manslaughter, because of the legal provocation. This result, however, is not attributable to any civil right, growing out of the relation, but to the fact that, to a certain extent, it has its origin in nature ; and a violation of the right which is peculiar -to it, in that respect, excites the
 
 furor brevis,
 
 whether the relation was- entered into with* or without the
 
 *238
 
 legal capacity, and the ceremonies and forms necessary to make a marriage valid for civil purposes. This is assumed to he the law in
 
 State
 
 v. John, 8 Ired Rep. 330, and has been so held upon the circuits.
 

 Thus far the line is established by these three cases.
 
 We
 
 are now to run further, and fix another landmark. In
 
 Alvaney
 
 v. Powell,
 
 supra,
 
 the Court was not called on to decide whether the children, after being emancipated with their mother, were to be considered as legitimate, or illegitimate; the purpose of the case being answered by holding that they all stand on the same footing ; because, in either view, they were entitled to succeed to their mother and to each other, both, according to our laws, and the laws of Canada. Nor are we now at liberty to decide it, because the facts of this case do not present it. Both parents were slaves when the relation was entered into. Afterwards, the father was emancipated, and bought the mother, and
 
 held her as his
 
 slave, at the birth of the lessor, Frances. This presents a question, in many respects, different from that of the
 
 status
 
 of a child born while both parents were slaves, and lived together as man and wife; for the relation of master and slave is wholly incompatible with even the qualified relation of husband and wife, as it is supposed to exist among slaves, and the idea that a husband may own his wife as property and sell her, if he chooses, or that a parent may own his children and sell or give them away as chattels, and that the wife or the children, are, nevertheless, entitled to any of the civil rights incident to those relations, involves, a legal absurdity. The relations are repugnant ; and as that of master and slave is fixed and recog-nised by law, the other cannot exist; and it follows that the lessor, Frances, does not take as one of the heirs of her father.
 

 The other lessors are in a condition still more unfortunate; for, while relieved from the incongruity, which is involved in the case of their sisters, by the fact, that their mother, at the time of their birth, was free, yet, that circumstance caused them to be unlawfully bogotten. Their parents, having become free persons, were guilty of a misdemeanor in living to*'
 
 *239
 
 gether as man and wife, without being married, as the law required ; so that, there is nothing to save them from the imputation of being “ bastards.”
 

 Our attention was called by
 
 Mr. Moore
 
 to
 
 Girod
 
 v. Lewis, 1 Cond. Louisiana Rep. 505, where it is held that, “ a contract of marriage, legal and valid by the consent of the master and moral assent of the slave, from the moment of freedom, although dormant during the slavery, produces all the effects which result from such contracts among free persons.” Ro authority is cited, and no reason is given for the decision, except the suggestion that the marriage, being dormant during the slavery, is endowed with full energy from the moment of freedom. We are forced to the conclusion, that the idea of civil rights being merely
 
 dormant
 
 during slavery, is rather a fanciful conceit, (we say it with respect) than the ground of a sound argument. It may be, that in Louisiana, the marriage relation is greatly affected by the influence of religion, and the mystery of its supposed dormant rights, is attributable to its divine origin. If so, the case has no application, for, in our courts, marriage is treated as a mere civil institution.
 

 To the suggestion, that as the qualified relation of husband and wife between slaves is
 
 not
 
 milawful, and ought, in fact, to be encouraged, upon the ground of public policy, so far as it comports with a right of property, emancipation should be allowed to have the effect of curing any defect arising from the non-observance of the prescribed form and ceremonies, and the absence of a capacity to contract, as there is plenary proof of consent, which forms the essence of the marriage relation ; the reply is:
 

 The relation between slaves is essentially different from that of man and wife joined in lawful wedlock. The latter is indissoluble during the lives of the parties, and its violation is a high crime ; but with slaves it may be dissolved at the pleasure of either party, or by a salé of one or both, depend-ant on the caprice or necessity of the owners. So the union is formed, and the consent given in reference to this state of
 
 *240
 
 things, and no ground can be conceived of, upon which the fact of emancipation can, not only draw after it the qualified relation, but by a sort of magic, convert it into a relation of so different a nature. In our case, the emancipation of the father could not draw after it the prior relation, because the mother wa-s not then free, and, in fact, afterwards became his slave. So the relation was not connected with the
 
 status
 
 of the parties in a way t© follow as an incident. Suppose, after being free, the father had married another woman, could he have been convicted of bigamy, on the ground that a woman, who was his slave, was his wife ? Or, after both were freed, would the penalty of the law have attached, if either had married a third person, living the other? Certainly not; because the averment of a prior, lawful marriage could notbesnp-ported, and yet, if the marriage followed the emancipation as an incident, it would present an instance of a marriage relation, which either is at liberty to dissolve at pleasure.
 

 The parties after being freed, ought to have married according to law; it is the misfortune of their children that they neglected or refused to do so, for no court can avert the consequences.
 

 Per Curiam, Judgment affirmed.